# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BEAU ELLERBEE | CIVIL ACTION |
| VERSUS | |
| STATE OF LOUISIANA DIVISION OF ADMINISTRATION, OFFICE OF TECHNOLOGY SERVICES, AND DEREK WILLIAMS, IN HIS OFFICIAL CAPACITY | 3:24-CV-00219 |

## RULING

This matter is before the Court on the Motion to Dismiss[1] filed by Defendants, the State of Louisiana, through the Division of Administration, Office of Technology Services ("OTS") (the "State"), and Derek Williams ("Williams"), in his official capacity (collectively, "Defendants"). Plaintiff Beau Ellerbee ("Ellerbee") opposes.[2] Defendants replied.[3]

For the following reasons, Defendants' motion[4] will be denied.

**I.    FACTUAL BACKGROUND**

On March 19, 2024, Ellerbee filed a Complaint against Defendants seeking injunctive relief, damages, attorney's fees, and costs pursuant to Title II of the Americans with Disabilities Act[5] ("ADA") and the Rehabilitation Act of 1973[6] ("RA").[7] Ellerbee

---

[1] Rec. Doc. 20.
[2] Rec. Doc. 21.
[3] Rec. Doc. 22.
[4] Rec. Doc. 20.
[5] 42 U.S.C. § 12131, *et seq.*
[6] 29 U.S.C. § 794, *et seq.*
[7] Rec. Doc. 1.

originally makes claims against the State and Williams under both the ADA and the RA, and prays for damages under Title II of the ADA as to both the State and Williams.[8] Defendants filed a Rule 12(b)(6), asserting Eleventh Amendment immunity.[9] On May 17, 2024, Ellerbee filed an Amended Complaint,[10] no longer seeking damages under the ADA and removing claims against the State under the ADA.[11] The Court thus denied the Defendants' initial Motion to Dismiss[12] as moot.[13]

Ellerbee alleges he is a qualified individual with a disability under the ADA.[14] Ellerbee is bilaterally blind, due to complications from diabetes.[15] Ellerbee asserts he is completely blind in both eyes and relies on audio screen-reading technology and braille aids to read.[16] He claims he has not been able to access information, complete trainings for his professional obligations, or fill out forms on several Louisiana government websites.[17]

Ellerbee alleges he has accessed a number of State government operated websites "for both personal use and as a tester."[18] He claims he regularly tried to access

---

[8] Rec. Doc. 1, ¶¶ 12-59.
[9] Rec. Doc. 12.
[10] Rec. Doc. 14.
[11] *Id.* at ¶¶12-59. Under the *Ex Parte Young* exception, the United States Supreme Court recognized an exception to Eleventh Amendment immunity, whereby "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). Thus, Ellerbee maintains his ADA claims against Williams in his official capacity. Rec. Doc. 14, ¶¶ 12-45. Ellerbee asserts a claim against Williams, as Chief Information Officer for the State Office of Technology Services, the political entity responsible for websites for all agencies in the executive branch in the State government. A state official sued in his official capacity is essentially a suit against the government entity and is an appropriate defendant in an ADA action.
[12] Rec. Doc. 12.
[13] Rec. Doc. 23.
[14] Rec. Doc. 14, ¶ 4.
[15] *Id.*
[16] *Id.* at ¶¶ 4-5.
[17] *Id.* at ¶¶14-28.
[18] *Id.* at ¶ 14.

the Louisiana Department of Health's website to review monthly Covid-19 numbers and information since 2020 but has had great difficulty navigating the page and accessing information.[19] He also alleges he was an Access Technology instructor for Lighthouse Louisiana and was required to complete Mandatory Reporter training through the Department of Children and Family Services ("DCFS") website for 2018 and 2019.[20] Ellerbee alleges he had to rely on a co-worker to help him complete the training.[21] He also attempted to complete an ethics training course through the Governor's Office of Disability Affairs websites in 2020, but again required the assistance of a co-worker to complete the training.[22] Ellerbee claims he visited several other State government websites as a tester, but found that none of the websites were ADA compliant, as recently as January 25, 2024.[23] He plans to regularly visit the websites.[24]

Ellerbee uses an audio screen reader to access internet content.[25] He claims the websites failed to include the proper HTML code and alternative text, which is necessary for the screen reader to work properly.[26] He claims that, on September 12, 2022, James E. Mitchell ("Mitchell"), Ph.D., an IT Statewide Senior GIS Applications Developer performed a partial audit of some of the websites and found only 3 out of 20 were ADA compliant.[27] Ellerbee claims Mitchell discussed the audit results with Defendants during a December 12, 2022 Governor's Advisory Council on Disability Affairs Accessibility

---

[19] *Id.* at ¶ 15.
[20] *Id.* at ¶16.
[21] *Id.*
[22] *Id.* at ¶ 17.
[23] *Id.* at ¶¶18-19.
[24] *Id.* at ¶18.
[25] *Id.* at ¶ 20.
[26] *Id.* at ¶ 21.
[27] *Id.* at ¶ 22.

Meeting and posted them for public viewing.[28] Ellerbee also attended, via videoconference, a meeting on September 18, 2023 of the Governor's Advisory Council on Disability Affairs.[29] Ellerbee claims he told the Council about his difficulty accessing government websites and that Mitchell referred to his audit and ongoing accessibility issues.[30] He alleges Matthew Vince, Director of Project Management at OTS acknowledged the issues but stated the State was still in the process of analyzing the websites.[31]

Ellerbee claims that Defendants have failed to bring their noncompliant websites into ADA compliance.[32] Ellerbee alleges the Department of Justice ("DOJ") published a Noticed of Proposed Rulemaking in August 2023, which emphasized that the ADA applies to barriers to access on websites just as it applies to barriers on physical property.[33]

Ellerbee seeks injunctive relief, attorney's fees, and costs for violations of Title II of the ADA against Williams, in his official capacity as the Louisiana State Chief Information Officer.[34] Ellerbee also seeks injunctive relief, damages, attorney's fees, and costs for violations of the RA against both the State and Williams.[35]

Defendants responded with the instant motion, arguing that the action is premature.[36] Defendants contend federal regulations allow all state and local government entities until April 26, 2026, to comply with new federal regulations establishing technical

---

[28] *Id.* at ¶ 23.
[29] *Id.* at ¶ 24.
[30] *Id.* at ¶ 25.
[31] *Id.*
[32] *Id.* at ¶26.
[33] *Id.* at ¶ 41.
[34] *Id.* at ¶¶ 12-59.
[35] *Id.*
[36] Rec. Doc. 20.

standards for websites and web applications to be accessible to individuals with disabilities.[37]  Defendants further contend that because Ellerbee cannot state a viable Title II ADA claim against the State, there is no viable RA claim.[38]  Ellerbee responds that the new rule does not prevent him from pursuing a claim against a public entity for failure to make their website or online services accessible.[39]  Ellerbee further contends he states a valid claim under the ADA and the RA.[40]

## II.  LAW & ANALYSIS

### A.  Motion to Dismiss Under Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[41]  The Court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[42]  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[43]  In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation

---

[37] Rec. Doc. 20-1 at p. 1.
[38] *Id.* at p. 8.
[39] Rec. Doc. 21 at p. 2.
[40] *Id.* at p. 3.
[41] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004)).
[42] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal citations omitted).
[43] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d at 467).

of the elements of a cause of action will not do."[44] A complaint is also insufficient if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[45]

However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46] In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully."[47] "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[48] On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[49]

### B. Public Facilities/Services and the ADA

The ADA "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[50] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[51] "Title II of the ADA focuses on disability discrimination in

---

[44] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal citations and brackets omitted)(hereinafter "*Twombly*").
[45] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L. Ed.2d 868 (2009)(hereinafter "*Iqbal*").
[46] *Iqbal*, 556 U.S. at 678.
[47] *Id.*
[48] *Taha v. William Marsh Rice University*, 2012 WL 1576099, at *2 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[49] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).
[50] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)(en banc)(citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (internal quotation marks omitted)).
[51] *PGA Tour*, 532 U.S. at 675, 121 S.Ct. 1879.

the provision of public services."[52]  Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[53] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[54]

Similarly, "Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[55]  Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[56] The ADA and the RA are generally interpreted *in pari materia*.[57] "Indeed, Congress has instructed courts that 'nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the RA ... or the regulations issued by Federal agencies pursuant to such title.'"[58]

"To show a violation of either statute, a plaintiff must prove: '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against

---

[52] *Frame*, 657 F.3d at 223.
[53] 42 U.S.C. § 12132.
[54] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).
[55] *Frame*, 657 F.3d at 223.
[56] 29 U.S.C. § 794(a).
[57] *Frame*, 657 F.3d at 223 (citing *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–88, 289 n. 76 (5th Cir. 2005) (en banc)).
[58] *Frame*, at 223–24 (quoting 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

by the public entity; and (3) that such discrimination is by reason of his disability.'"[59]

Pursuant to his authority, the United States Attorney General has promulgated regulations implementing Title II.[60] These regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[61] A public entity is required to operate "each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[62] Thus, Title II requires "program accessibility."[63]

### C. Ellerbee states a plausible claim for relief under both the ADA and the RA.

The parties do not dispute that Ellerbee is a qualified individual with a disability and that he was qualified to receive the services and benefits of the public entity.[64] Defendants acknowledge Ellerbee claims accessibility issues with their websites due to his disability.  Here, Ellerbee sufficiently alleges that he is a qualified individual with a disability, under the ADA.[65]  Specifically Ellerbee alleges he is bilaterally blind, due to a complication from diabetes.[66]  He states that, due to his disability, he is substantially impaired in several major life activities, is completely blind in both eyes and relies on

---

[59] *Miraglia v. Bd. of Supervisors of La. St. Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).
[60] 42 U.S.C. § 12134(a).
[61] 28 C.F.R. § 35.149.
[62] *Id.* at § 35.150(a).
[63] *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).
[64] Rec. Doc. 20-1 at pp. 2-3; Rec. Doc. 21 at pp. 8-10.
[65] Rec. Doc. 14, ¶4.
[66] *Id.*

audio-screen reading technology and braille aids to read.[67] This is sufficient to meet the first element.[68]

The parties' dispute centers on the second element of whether Defendants violated Title II or the RA by denying Ellerbee the benefits of the services, programs, or activities for which the public entity is responsible, or by subjecting him to discrimination.[69] Thus, the issues before the Court are whether Title II and the RA apply to Defendants' websites and whether Ellerbee sufficiently alleges that Defendants denied him "the benefit of services, programs, or activities for which the public is responsible" by failing to make its websites accessible to Ellerbee."[70]

Ellerbee alleges that OTS is the public entity responsible for providing the benefits of "services, programs, or activities" of the State as a public entity.[71] He further alleges that, due to this disability and the barriers to access to Defendants' websites, he is being denied the benefits of "services, programs, or activities" for which Defendants are responsible.[72] He further claims such discrimination is because of his disability.[73]

Defendants simply refute that they must comply before the compliance deadline with the new technical standards for a public entity's website to be accessible under the

---

[67] *Id.* at ¶ 5.
[68] *See* 29 C.F.R. § 1630.2(g)(1)(i) ("Disability means, with respect to an individual[,a] physical or mental impairment that substantially limits one or more major life activities of such individual[.]"; 42 U.S.C. § 12102(A) ("[M]ajor life activities include . . . seeing . . . .").
[69] Rec. Doc. 20-1 at pp. 6-9; Rec. Doc. 21 at pp. 8-10.
[70] Defendants do not argue Ellerbee failed to allege he is a qualified individual with a disability. Here, Ellerbee alleges he is bilaterally blind, due to a complication from diabetes. Rec. Doc. 14, ¶4. He states that, due to his disability, he is substantially impaired in several major life activities, is completely blind in both eyes and relies on audio-screen reading technology and braille aids to read. *Id.* at ¶ 5. Ellerbee sufficiently alleges he is disabled within the meaning of the ADA and the RA. *See* 42 U.S.C. § 12102(1)(A).
[71] Rec. Doc. 14, ¶¶6-8, ¶35.
[72] *Id.* at ¶¶ 34-42.
[73] *Id.* at ¶ 36.

ADA, or that a Court should enjoin them to comply with a separate standard during their grace period for compliance with the new rule.[74]

Defendants seek dismissal of Ellerbee's claims as premature.[75] Defendants argue that Ellerbee's suit was filed before any technical standards governing accessibility of websites had been adopted by DOJ and before the enforcement date.[76] Defendants also contend the alleged materials referred to in Ellerbee's Complaint may fall under the "archived web content"[77] exception.[78] Defendants argue the State has not violated Title II of the ADA and has until 2026 to comply with the new federal mandates for website accessibility, making the lawsuit premature.[79]

Defendants note there are no cases within the Fifth Circuit addressing the issue of whether a state's maintenance of publicly accessible websites and its alleged failure to make the websites fully accessible to disabled individuals violates Title II of the ADA.[80] Defendants state that some district courts have held a plaintiff can state a viable claim under Title II of the ADA based on a website, while some have not.[81] Defendants admit that Ellerbee is correct that DOJ has "emphasized that the ADA applies to barriers to

---

[74] Rec. Doc. 20-1 at pp. 3-8.
[75] *Id.* at p. 5.
[76] *Id.*
[77] *Id.* at pp. 5-6.  "Archived web content" is defined as content that:
   (1) Was created before the date the public entity is required to comply with subpart H of this part, reproduces paper documents created before the date the public entity is required to comply with subpart H, or reproduces the contents of other physical media created before the date the public entity is required to comply with subpart H;
   (2) Is retained exclusively for reference, research, or recordkeeping;
   (3) Is not altered or updated after the date of archiving; and
   (4) Is organized and stored in a dedicated area or areas clearly identified as being archived.
[78] *Id.*
[79] *Id.* at p. 6.
[80] *Id.* at p. 7.
[81] *Id.*

access on websites just as it applies to barriers on physical property."[82]  However, they contend that DOJ has only recently approved specific technical standard and recognizes that public entities have a reasonable amount of time to come into compliance with these new requirements through 2026.[83]

Defendants take issue with Ellerbee's demand that the Court issue an injunction ordering immediate compliance and awarding damages, costs, and attorney's fees.[84] Defendants contend that ordering compliance, where the State would already be required to come into compliance, along with the fact that most, if not all, of the web pages viewed by Ellerbee will fall into exceptions, should be dispositive.[85]  Further, Defendants contend that requiring the Court to fashion whatever "lower standard," with no guidance in case law or anything outside of "general nondiscrimination requirements."[86]  Moreover, Defendants contend this "lower standard" would only apply from whatever date until required to comply with the new technical standards in April 2026.[87]  The gist of Defendants' arguments seems to state that because no technical standards exacted how a public entity's website should be accessible to a qualified individual such as Ellerbee, he cannot state a plausible claim for relief under the ADA or the RA.

Ellerbee argues the new rule does not prevent him from pursuing a claim against a public entity for failure to make their website or online services accessible.[88]  Ellerbee contends they may still assert a claim; however, he is obligated to prove his case using

---

[82] *Id.*
[83] *Id.* at pp. 7-8.
[84] *Id.* at p. 8.
[85] *Id.*
[86] Rec. Doc. 22 at p. 2.
[87] *Id.*
[88] Rec. Doc. 21 at p. 2.

existing regulations and general non-discrimination requirements without the benefit of the stricter new rule.[89]  Ellerbee further contends that the DOJ has brought many enforcement actions related to this issue.[90]  Ellerbee argues that the broad non-discrimination requirements of Title II apply to the inaccessibility of Defendants' websites.[91]

Ellerbee contends the lower standard pre-existing the new rule asks whether the public entity's programs are readily accessible to and usable by individuals with disabilities.[92]  Ellerbee further contends his allegations of inaccessibility and lack of compliance with Title II of the ADA fall within the existing regulations requiring public entities to use auxiliary aids and services.[93]  Ellerbee contends he alleges more than adequate facts for the Court to infer at the pleading stage that Defendants' websites and web content, when viewed in its entirety, are not readily accessible to and usable to him or other sight-impaired individuals.[94]  He alleges more than adequate facts for the Court to infer that Defendants have violated the auxiliary aid requirements by failing to provide their services in accessible formats.[95]

Ellerbee contends that the Ninth Circuit Court of Appeals has held that the lack of guidance from the DOJ as to Title II of the ADA does not preclude enforcement of the plain language of the statute.[96]  In *Fortyune v. City of Lomita*, the Ninth Circuit stated that "text of the ADA, the relevant implementing regulations, and the DOJ's interpretation of

---

[89] *Id.* at pp. 2-3.
[90] *Id.*
[91] *Id.* at p. 7.
[92] *Id.* at p. 8.
[93] *Id.*
[94] *Id.* at p. 9 (citing 28 C.F.R. § 35.105(a)).
[95] *Id.* (citing 28 C.F.R. § 35.160(b)(1)(2)).
[96] *Id.* at p. 6 (citing *Fortyune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014)).

its own regulations all lead us to conclude that public entities must ensure that all normal governmental functions are reasonably accessible to disabled persons, irrespective of whether the DOJ has adopted technical specifications for the particular types of facilities involved."[97]  Although *Fortyune* did not deal with accessibility to public websites, Plaintiff likens it to Title II's broad non-discrimination requirement of the ADA, "irrespective of whether the DOJ has adopted technical specifications[.]"[98]

Here, Ellerbee sufficiently alleges he is being denied the benefits of services, programs, or activities for which the State is responsible, and that he is being discriminated against due to his disability.[99]  Both parties admit – and the Court agrees – there is no controlling case law on the issue of accessibility of websites under Title II of the ADA.[100]  And it is clear that few courts have addressed Title II claims in the website context.  However, other federal courts have applied Title II to websites operated by public entities.[101]  The parties further agree that before the passage of the final rule there was no specific technical standard for website accessibility for state and local governments.[102]

Prior to the passage of the final rule at issue here, the DOJ had interpreted that the ADA covers websites that are operated by public entities and that such sites must provide their services in an accessible manner or provide an alternative accessible way

---

[97] 766 F.3d at 1106.
[98] *Id.*
[99] Rec. Doc. 14, ¶¶33-39.
[100] Rec. Docs. 20-1 at p. 7, 22 at p. 1.
[101] *See Hindel v. Husted*, 2017 WL 432839, at *5 (S.D. Ohio Feb. 1, 2017) (finding the Secretary of State's website violated Title II of the ADA because it was not formatted in a way accessible to all individuals, especially blind individuals like the plaintiffs whose screen access software could not be used on the website); *Meyer v. Walthall*, 528 F.Supp. 3d 928, 958-59 (S.D. Ind., 2021) (finding that the state's government benefits websites constituted "services, programs, or activities" within the purview of Title II).
[102] Rec. Docs. 20-1 at pp. 3-4, 21 at p. 3, 22 at p. 1.

for citizens to use the programs or services.[103] DOJ has specifically stated that it "has enforced the ADA in the area of website accessibility on a case-by-case basis under existing rules . . . and will continue to do so until the issue is addressed in a final regulation."[104]

DOJ guidance states that when the ADA was first implemented in 1991, "the web was in its infancy – and mobile apps did not exist – so State and local government entities did not use either the web or mobile apps as a means of providing services to the public."[105] DOJ has further articulated that it interprets the ADA to apply to websites of covered entities, "ensuring that individuals with disabilities are not, by reason of such disability, excluded from participation in or denied the benefits of the services, programs, or activities offered by State and local government entities, including those offered via the web . . . and when public entities use mobile apps to offer their services, programs, or activities."[106]  Further, the Department recognizes that because it "had not previously adopted specific technical requirements for web content and mobile apps through rulemaking, public entities have not had specific direction on how to comply with the ADA's general requirements of nondiscrimination and effective communication. However, public entities still must comply with these ADA obligations with respect to their web content and mobile apps, including before this rule's effective date."[107]

Regulations under Title II further require public entities to provide "auxiliary aids" to ensure that communication with disabled individuals is as "effective" as communication

---

[103] 28 C.F.R. § Pt. 35, App. A.
[104] *Id.*
[105] *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*, 89 FR 31320-01, at *31323 (April 24, 2024).
[106] *Id.* at *31323-24.
[107] *Id.* at 31324.

with nondisabled individuals.[108]  This includes "accessible electronic and information technology," such as "screen reader software," or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[109]

Ellerbee alleges that, in August 2023, DOJ published a Notice of Proposed Rulemaking for its intentions to adopt more specific technical standards for state and local government websites to ensure equal access to web content and mobile apps for people with disabilities.[110]  Ellerbee further alleges that DOJ recognized it has consistently made clear that the Title II nondiscrimination provision applies to *all* services, programs, and activities of public entities, including those provided via the web.[111]  The new regulations proposed technical standards for web content and mobile apps to give public entities greater clarity how to meet their ADA obligations and ensure equal access.

Subsequent to filing his Complaint, but prior to filing his Amended Complaint, DOJ passed a final rule – at issue here – for establishing technical standards to make accessible the services, programs, and activities offered by the State and local government entities to the public through the web and mobile applications ("apps").[112] The final rule became effective on June 24, 2024.[113]  However, public entities with a total

---

[108] 28 C.F.R. §35.160(b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.").
[109] 28 C.F.R. § 35.104.
[110] Rec. Doc. 14, ¶ 41.
[111] *Id.*
[112] *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*, 89 FR 31320-01, 2024 WL 1741049.
[113] *Id.*

population of 50,000 or more have through April 24, 2026 to comply with the rule,[114] with exceptions for certain content.[115]

Under the new regulations, a public entity shall ensure that the following are accessible to and usable by individuals with disabilities: (1) web content that a public entity provides or makes available, directly or through contractual, licensing, or other arrangements; and 2) mobile apps that a public entity provides or makes available, directly or through contractual, licensing, or other arrangements.[116] The new regulations provide specific exceptions in which the State would not be required to meet the newly adopted standards, including for: (1) archived web content; (2) preexisting conventional electronic documents, unless such documents are currently used to apply for, gain access to, or participate in the public entity's services, programs, or activities; (3) content posted by a third party, unless the third party is posting due to contractual, licensing, or other arrangements with the public entity; (4) conventional electronic documents that are about a specific individual, their property, or their account and that are password-protected or otherwise secured; and (5) preexisting social media posts.[117]

The final rule requires public entities to comply with Level A and Level AA success criteria and conformance requirements specified in the Web Content Accessibility Guidelines ("WCAG")[118] 2.1, Level AA, as the technical standard, unless the public entity

---

[114] 28 C.F.R. § 35.200(b)(1).
[115] 28 C.F.R. § 35.201.
[116] 28 C.F.R. § 35.200(a).
[117] 28 C.F.R. § 35.201.
[118] Web Accessibility Initiative, https://www.w3.org/WAI/standards-guidelines/wcag/ (last visited Jan. 27, 2025).

can demonstrate that compliance would result in a fundamental alteration in the nature of the service, program, or activities or in undue financial and administrative burdens.[119]

Federal regulations provide that an individual who believes that he or she or a specific class of individuals has been subjected to discrimination based on disability may, by himself or herself or by an authorized representative, file a complaint.[120]

The United States District Court for the Southern District of Indiana recognized that websites fall within the "services" of a public entity under Title II. There, the court found that websites that provide information about and applications for vital government benefits are covered by the RA. *Meyer v. Walthall*, 528 F.Supp.3d 958 (S.D. Ind. 2021). And the court found that an online benefits portal, homepage, and Medicaid homepage of a state agency responsible for administering public benefits programs are within the purview of Title II and must be accessible to individuals with disabilities. *Id*. In *Meyer*, as is the case here, technical standards are informative to, but are not dispositive of, the issue of whether Defendants' websites violate Title II and the RA. *Id.* at 961.

Similarly, the fact that the technical standards have yet to be enforceable does not prohibit Ellerbee from stating a claim for violation of Title II or the RA for failing to make a public entity's "services, programs or activities" readily accessible to him as a disabled individual. The technical standards are merely illustrative of whether a website complies with Title II or the RA's accessibility requirement – a factual determination for the trier of fact at the summary judgment stage or trial. They do not, however, dispose of ADA's program accessibility requirements.

Defendants cite two non-binding district court cases where the courts held that "a

---

[119] 28 C.F.R. § 35.
[120] 28 C.F.R. § 35.170(a).

plaintiff cannot state a viable claim under Title II of the ADA based on a website.[121] In *Price v. City of Ocala, Florida*, the Court created a framework for Title II website cases and dismissed the suit for lack of standing because the plaintiff failed to allege an injury-in-fact or future injury.[122] However, the court allowed him an opportunity to amend his complaint to reallege standing.[123] In *Gill v. Broward County, Florida*, the court applied Title III caselaw to a Title II claim and dismissed plaintiff's website accessibility claims, requiring plaintiff to show his "inability to use the Website impedes his access to Defendant's physical buildings or facilities."[124] However, the court in *Price* acknowledged the *Gil* court's problematic lumping together of all ADA cases for all website violations, noting "Title III website cases are largely inapplicable to proving a future injury in Title II website cases because there is no requirement that a violation be tied to a physical location."[125] However, Defendants provide no supporting caselaw as to prematurity of Ellerbee's claims.

Additionally, drawing from the text of § 12132, the United States Court of Appeals for the Fifth Circuit has found that "an injury occurs (and a complete and present cause of action arises) under Title II when a disabled individual has sufficient information to know that he has been denied the benefits of a service, program, or activity of a public entity."[126] The Fifth Circuit has also held that "a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute

---

[121] Rec. Doc. 20-1 at p. 7.
[122] 375 F.Supp. 3d 1264, 1275 (M.D. La. 2019).
[123] *Id.*
[124] 2019 WL 4941108, at *3 (S.D. Fla. May 7, 2018).
[125] *Price v. City of Ocala, Florida*, 375 F. Supp.3d 1264, 1272 (M.D. Fla. 2019).
[126] *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011).

intentional discrimination under the ADA."[127]

Here, construing the allegations of the Amended Complaint in a light most favorable to Ellerbee, the Court finds that Ellerbee sufficiently alleges that Defendants denied him meaningful access to the benefits of services, programs, or activities for which the State is responsible, resulting in discrimination based on his disability. Having plausibly alleged that Ellerbee is a qualified individual and that the Defendants responsible for the provision of services, programs, and activities discriminated against him on the basis of his disability, the Court finds that Ellerbee states claims under Title II and the RA.

## III.  CONCLUSION

For the reasons set forth above, Defendants' Motion[128] shall be denied to the extent they seek dismissal of Ellerbee's Title II and RA claims.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on this  28th  day of January, 2025.

_____
**SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA**

---

[127] *Adams v. Louisiana Dep't of Corr.*, No. CV 22-20-SDD-RLB, 2024 WL 4280924, at *9 (M.D. La. Sept. 24, 2024).
[128] Rec. Doc. 20.